Mona BRONSON et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the SCHOOL DISTRICT OF the CITY OF CINCINNATI et al., Defendants.

No. C-1-74-205.

United States District Court, S. D. Ohio, W. D.

Oct. 16, 1980.

Thomas I. Atkins, Gen. Counsel, NAACP Special Contribution Fund, New York City, * G. Phillip Arnold and William E. Caldwell, Ratner & Sugarmon, Elizabeth McKanna, Memphis, Tenn., John Guthrie, Leonard D. Slutz, Wood, Lamping, Slutz & Reckman, Cincinnati, Ohio, Solvita McMillan, Bay Village, Ohio, Teresa Demchak, Cleveland, Ohio, for plaintiffs.

* John A. Lloyd, Jr., Nancy A. Lawson, Glen Weissenberger, Cincinnati, Ohio, for City of Cincinnati School Dist.

* A. David Nichols, Marilyn C. Reece, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State Bd. of Ed.

Gary E. Brown, Asst. Atty. Gen., Columbus, Ohio, for William J. Brown, Atty. Gen.

Richard W. Ross, Asst. Atty. Gen., Columbus, Ohio, for James A. Rhodes, Governor.

* James W. Farrell, Jr., Dinsmore, Shohl, Coates & Deupree, Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist. and Reading Community City School Dist.

Bruce I. Petrie, Graydon, Head & Ritchey, John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for Indian Hill Exempted Village School Dist.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for Lockland City School Dist.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for Princeton City School Dist.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for Finneytown Local

* Members of the Steering Committee.

School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., and Hamilton County School Dist.

John C. Elam, Vorys, Sater, Seymour & Pease, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Wyoming City School Dist.

James W. Harper, Cincinnati, Ohio, for Oak Hills Local City School Dist.

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for Green Hills-Forest Park City School Dist.

William E. Santen, Santen, Santen & Hughes Co., LPA, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for Sycamore City School Dist.

Philip S. Olinger, Terrace Park, Ohio, for Mt. Healthy School Dist.

TABLE OF CONTENTS

I. Historical Perspective—An Overview
 A. *Deal v. Cincinnati Board of Education* ____ 1253
 1. Deal I _____ 1253
 2. Deal II _____ 1255
 B. *Bronson v. Board of Education* _____ 1257
 1. Opinion Determining Affirmative Defense (doc. # 56, Porter, J.) _____ 1258
 2. Sixth Circuit Opinions – Interlocutory Appeal on Application of Collateral Estoppel _____ 1260
 a. Opinion of the Court (Lively, J.) __ 1260
 b. Concurring Opinion (Phillips, C. J.) 1261
 c. Dissenting Opinion (Weick, J.) ____ 1262
 3. Certification of Class; Interpretation of Sixth Circuit Decision (doc. # 266, Porter J.) _____ 1262
 4. Plaintiffs' Intent to Attack *Deal* _____ 1263
 5. March 10, 1980 Preclusion Order Concerning Plaintiffs' Expert Witnesses _____ 1264
II. Interpretation of the Sixth Circuit Decision in *Bronson* on Collateral Estoppel and Related Evidentiary Matters _____ 1265
 A. Impact and Application of Judge Phillips' Concurring _____ 1265
 B. Application of Collateral Estoppel to *Bronson* Plaintiffs—Judge Lively's Opinion _____ 1265
 C. Application of Collateral Estoppel to State and Suburban Defendants _____ 1274
 D. Admissibility of Pre-*Deal* Evidence _____ 1275
 1. "Old" Pre-*Deal* Evidence _____ 1275
 2. "New" Pre-*Deal* Evidence _____ 1276
 E. Admissibility of Cumulative Evidence ____ 1277
III. Summary of Conclusions _____ 1278

ENTRY SETTING FORTH THIS COURT'S INTERPRETATION OF SIXTH CIRCUIT OPINION IN BRONSON V. BOARD OF EDUCATION, 525 F.2d 344 (1975)

RICE, District Judge.

## I. HISTORICAL PERSPECTIVE—AN OVERVIEW

### A. *Deal v. Cincinnati Board of Education*

#### 1. *Deal I*

The history of desegregation litigation against the Cincinnati Board of Education dates back to 1963, when a class action was commenced by black children and their parents, who were complaining of alleged racial imbalance in the Cincinnati public schools. In *Deal v. Cincinnati Board of Education*, 244 F.Supp. 572 (S.D.Ohio 1965) (*Deal* I), a trial was conducted under an agreement whereby the plaintiffs were to present their entire case and then defendants were to present their entire case, except for responsive expert testimony.

During presentation of plaintiffs' case, the trial judge, Judge Peck, denied the plaintiffs' request to call various Board members, not named as parties to the action, as adverse witnesses. *Id.* at 574–75. Judge Peck also held that evidence of actions taken or omitted by public or private agencies or entities not named in the suit was inadmissible on the ground that the school board was in no way responsible for such actions or omissions. *Id.* at 579.

At the close of plaintiffs' case, the defendants moved for judgment; however, Judge Peck reserved ruling on said motion until completion of defendants' case. *Id.* at 573. Thereafter, and without considering defendants' "factual" case, Judge Peck granted the defendants' motion for judgment.

Discussing what plaintiffs had established on the record, Judge Peck pointed out that an agreed and executed stipulation was received in evidence, with 249 exhibits detailed therein. *Id.* at 579. This stipulation established various facts about the or-

ganization of the Cincinnati school system, school enrollment for the 1964–65 school year, historical background culminating in a tabulation of school population which showed the general increase of the school population over the years, and the racial trends in that population. *Id.* at 580. He further found that other joint exhibits, which contained massive statistical data, maps of residential areas and records establishing facts concerning the employment and hiring of Negro and white personnel could be fairly summarized as establishing:

"The Cincinnati Public School System includes a number of schools which are attended almost entirely by Negro pupils, a number of schools attended entirely by white pupils, and a number of schools attended by both Negro and white pupils in various percentages of each of the races; the racial composition of each school is simply a result of the racial composition of the neighborhood which they serve."

*Id.* Judge Peck also found that the stipulation supported the defendants' contention that:

"The defendant Board has always operated its school under what is commonly referred to as the 'neighborhood plan,' which is provided by Ohio Revised Code, Section 3313.48 . . . ."

*Id.* at 581.

Judge Peck stated that the basic issue in the case was expressed in the following paragraph of a policy statement adopted by the Cincinnati Board of Education on March 9, 1964:

" '(2) The Board does not accept the concept of de facto segregation and will not agree to any proposal to bus students, to transfer classes *or any other program to attempt to balance the races as such.*' "

*Id.* (emphasis added). The Court then addressed the question of "whether on the case presented by plaintiffs this Court has either the right or the duty to enjoin the establishment of any program 'to attempt to balance races' in the subject school system." *Id.*

Reviewing the record, Judge Peck noted that after over two years of access to de-

fendants' files and records, plaintiffs failed "to produce evidence to establish a policy of segregation or gerrymandering on the part of the defendants . . ." *Id.* at 582. To him, this failure "strongly suggests that such practices have not been engaged in." *Id.* Consequently, Judge Peck made the following finding:

"It is here found that plaintiffs have failed to establish a deprivation of rights under the law or under the Constitution of the United States by the requisite degree of proof and that they are therefore not entitled to the relief prayed for in the Amended Complaint."

*Id.*

On appeal, the Sixth Circuit Court of Appeals affirmed on the issue of non-intentional racial imbalance, holding:

"[T]here is no constitutional duty on the part of the Board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance that it did not cause, nor is there a like duty to select new school sites solely in furtherance of such a purpose."

*Deal v. Cincinnati Board of Education,* 369 F.2d 55 (6th Cir. 1966), *aff'g,* 244 F.Supp. 572 (S.D.Ohio 1965), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

In reaching this conclusion, the Court applied the standard of "equal educational opportunity" in reviewing the district court's findings and conclusions. 369 F.2d at 59. It stated that "(e)qual opportunity requires that each child start the race without arbitrary official handicaps, it does not require that each shall finish in the same time." *Id.* at 60. The Court rejected the appellants' claim that the situation in Cincinnati, with some schools predominantly black, some predominantly white, and some of mixed percentages, presented the same separation, and hence, the same constitutional violation condemned in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Id.*

The Court determined that "the only limit on individual choice in education imposed by state action is the use of the neighbor-

hood school plan," *id.*, but that this limitation did not share the "arbitrary, invidious characteristics of a racially restrictive system." *Id.* If a pupil or parent was displeased by the student's placement, the situation could be remedied by moving into a different neighborhood. *Id.* The obstacles to such a move, according to the Court, "stem from his individual economic plight, or result from private, not school, prejudice." *Id.*

Although affirming on the issue of non-intentional racial imbalance, the Court found that Judge Peck's general findings did not present an adequate basis for review of the issue of discrimination in the "context of a great metropolitan educational complex." *Id.* at 64. Specifically, the Court sought findings on the issue of whether the racial imbalance was intentionally caused by gerrymandering or by other alleged discriminatory practices on the part of the Board." *Id.*

Judge Peck made a general finding that the appellants had failed to produce evidence to establish gerrymandering or other discriminatory practices, but the Court of Appeals stated that such findings must be supported by subsidiary findings of fact. *Id.* The Court of Appeals also sought findings concerning "whether the District Judge considered plaintiffs' expert testimony of such relevance, weight or probative value as to make an issue calling for rebuttal proof by defendant." *Id.* at 65. The case was, therefore, remanded to the district court "for further findings on the issues of claimed discrimination in specific schools and programs and claimed harm to Negro students, allegedly caused by racially imbalanced schools, and for the taking of such additional relevant evidence as either party may offer." *Id.* at 65.

### 2. *Deal II*

On remand, Judge Peck again sat as the trial judge. *Deal v. Cincinnati Board of Education* (Deal II), 419 F.2d 1387 (6th Cir. 1969), *cert. denied* 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). Although plaintiffs suggested that new evidence of occurrences, transpiring since the first trial should be introduced, they did not follow

through with this; thus, such evidence was neither considered nor incorporated into the Court's subsidiary findings of fact.

Judge Peck considered the plaintiffs' contention that the United States Supreme Court had substantially modified the law since the date of the Court of Appeals' decision. 419 F.2d at 1396. This contention was rejected and the supporting authorities were distinguished. *Id.* Judge Peck also reaffirmed his previous ruling to exclude evidence of racial discrimination in the private and public housing market. *Id.* at 1397.

Judge Peck then set forth eighteen (18) Subsidiary Findings of Fact, which are produced in full in the appendix to the Sixth Circuit's second opinion. *See*, 419 F.2d at 1398–1401. Those findings are not reported elsewhere. Paraphrasing and summarizing, Judge Peck's Subsidiary Findings of Fact are as follows:

1. Separate educational facilities for black and white students were required by law until 1887. Since 1887, blacks have attended neighborhood schools on the same basis as white children, except for voluntary attendance in nondistricted schools, until 1955 when the last such school was districted. *Id.* at 1398.

2. Cincinnati schools are operated under a neighborhood plan, in which the high schools are fed from attendance zones of nearby junior high schools, which are in turn fed from attendance zones of nearby elementary schools. The various districts follow irregular lines and patterns determined by the Superintendent. Such irregular lines and patterns are complicated by Cincinnati's topography and manmade barriers, such as railroads, public thoroughfares, and expressways. To the extent that the Board has any control over causation, the Superintendent avoids the possibility of predominantly black schools, whenever possible. *Id.*

3. Virtually every possible proportionate combination of white and black children exists in the Cincinnati school system. Proportions are not constant, and despite the absence of substantial changes in school attendance zones, twelve schools changed to a high concentration of black students. *Id.* at 1398–99.

4. Two schools in the Cincinnati school system are exceptions from the neighborhood plan. One of those schools provides a special college preparatory program. The other provides special programs for slow learners and the handicapped. *Id.* at 1399.

5. The record does not contain substantial evidence to support plaintiffs' claim that attendance school boundary lines have been gerrymandered to exclude blacks from certain schools. A high correlation exists between distribution of blacks throughout the school system to the general neighborhood residential patterns. Some areas and school which were predominantly white are now predominantly black. *Id.*

6. The record contains no evidence to support the claim that the decision to assign the area served by Lincoln Elementary School to Withrow Junior High instead of to Eastern Hills Junior High was a gerrymandering to exclude blacks; that determination was based on geographical and fiscal considerations. *Id.*

7. Attendance zone boundary changes concerning Evanston Elementary and Hyde Park Elementary Schools were made to correct overcrowding at Evanston and to take advantage of vacant space at Hyde Park. No lasting change was made on the racial composition of Evanston. *Id.*

8. The opening of Ach Junior High School caused changes in the attendance areas of Withrow and Woodward Junior High Schools. These changes were the result of routine administrative decisions such as school building capacities. *Id.*

9. The schools in the Cincinnati system were overcrowded but the evidence showed that there was no relationship between the racial composition of a neighborhood and the decision of whether or not a new school building would be built there. *Id.*

10. Four junior high schools were needed in the Withrow High School district. During the time that these schools were being constructed or contemplated, a large population shift, involving the influx of blacks, into Walnut Hills and Evanston took place. The evidence indicates that the determination of attendance zone boundary lines were reasonable exercise of the Superintendent's discretion, and not made on the basis of race. *Id.*

11. The decisions made by the Superintendent with regard to the establishment of attendance zones for Aiken High School was complicated by topographical characteristics. These decisions and those made for schools with similar problems were on the basis of the Superintendent's professional judgment. No significant change in racial composition of the schools resulted from these administrative decisions. *Id.* at 1400.

12. Administrative decisions made concerning Madisonville were intended to maximize interracial experiences among children, and not on an attempt to gerrymander lines in order to artificially separate races. *Id.*

13. Pupil transfers in 1963–64 were necessary to relieve overcrowding at Evanston School. The evidence shows that difficult and complicated administrative problems were presented. The determination of the need for the transfer and the means by which it was accomplished was a reasonable exercise of the Superintendent's discretion, and had the effect of placing the races in

closer proximity with one another. *Id.*

14. The decision to transport students in the Millvale area to the Douglas school during the emergency, which began in 1956 and lasted for two years, was a sound administrative decision. It was more economical and, in other ways, preferable to transporting some students to certain schools and some to others, with the possible effect that some children from the same family would be attending different schools. *Id.*

15. Applications for transfer from one school to another to avoid attendance with students of another race have been consistently denied by defendants. *Id.* at 1401.

16. No inequality of educational facilities based on racial classification exists in Cincinnati schools. *Id.*

17. Evidence failed to show any relationship between racial composition of the schools and pupil achievement. *Id.*

18. Plaintiffs' experts' testimony was not of such relevance, weight or probative value as to establish an issue calling for rebuttal by the defendants. *Id.*

The plaintiffs again appealed Judge Peck's decision to the Sixth Circuit. 419 F.2d 1387 (6th Cir. 1969). Early in the opinion, Judge Weick, writing for the Court, noted that "[t]he District Court has completely complied with our order of remand . . . ." *Id.* at 1390.

The Court agreed with Judge Peck that Supreme Court cases decided subsequent to the first appeal did not significantly change the law applicable to this case. *Id.* The Court determined that reliance on those later cases was misplaced because:

"The gist of the holdings in these cases was that in desegregating a dual school system, a plan utilizing 'freedom of choice' or a variant 'free transfer' is not an end in itself and would be discarded where it did not bring about the desired result."

*Id.* The Court distinguishes those cases from *Deal*, stating:

"On the other hand, our case involves the operation of a long-established unitary non-racial school system—just schools where Negro as well as white children may attend in the district of their residence. There is not *an iota* of evidence in this record where any of the plaintiffs or any of the class which they represent, was denied admission to a school in the district of his residence."

*Id.* (Court's emphasis).

The Court rejected the plaintiffs' claim that the Board had a duty to bus children away from the districts of their residences to achieve racial balance. *Id.* at 1390–91. It also rejected plaintiffs' contention that the Board could not "close its eyes" to segregative housing patterns in the city. The Court found no basis for entering any order that would require children to be bused out of their neighborhoods, stating, "Boards of Education can hardly be blamed or held responsible for neighborhood residential patterns." *Id.* at 1392. Additionally, the Court rejected plaintiffs' arguments that there was discrimination in hiring and assigning of school personnel or that black children were receiving an inferior education because of inequality in educational facilities. *Id.* at 1394.

Having reviewed the record, and addressed the various contentions raised by plaintiffs, the Court concluded:

"The District Court in two hearings found against appellants on the factual issues of the case. In our judgment, the findings of fact of the District Court are supported by substantial evidence and are not clearly erroneous. Its conclusions are correct."

*Id.* at 1395. The United States Supreme Court denied *certiorari* for a second time in 1971, thus, ending over eight years of litigation. 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971).

B. *Bronson v. Board of Education*

The action currently before the Court was commenced in 1974, not long after a

newly elected Cincinnati Board of Education passed a resolution which effectively rescinded the directives of a resolution passed by the "lame duck" Board in December 1973. The December 10, 1973 Resolution, "Ordering the Racial and Economic Integration of Pupils in the Cincinnati Public Schools," directed the development and implementation of plans for racial and economic integration. Some $50,000 was budgeted for development and effectuation of such a plan or plans. Guidelines and criteria in the resolution included the immediate elimination of all school attendance districts, a redrawing of the attendance districts in accordance with the plan, and a September 1, 1974 deadline for completion of desegregation. The resolution was stated as reflecting the Board's acknowledgement that the existing segregation in the District was "the deliberate result of the acts and omissions of the Board and preceding Boards in their decision(s) with respect to sites of school buildings, size of school buildings, the use of temporary or rental classrooms," etc. An almost inevitable outcome of this resolution would have been large-scale busing of students in the Cincinnati public school system.

The newly elected Board, in its January 4, 1974 Resolution effectively neutralized the December resolution. It reinstated the old boundary lines; budget appropriations for planning were eliminated as was the Superintendent's authority to develop and implement plans for integration consistent with the December resolution. The September 1, 1974 deadline was also eliminated. The January resolution also noted that the earlier resolution failed to deal with quality integrated metropolitan education.

Part of the relief sought in the present action is reinstatement of the December 10, 1973 Resolution. The plaintiffs allege that the Cincinnati Board of Education has engaged in and has maintained discriminatory policies, customs, practices, and usages that have resulted in the public school system, composed of sets of schools which are either all or predominantly black or all or predominantly white. *See* Second Amended Complaint (doc. # 204).

The suburban defendants are named either because of the alleged effect of segregation in Cincinnati or because of alleged direct participation in segregative acts which have significantly contributed to the containment of black children in segregated, virtually all-black schools in the City of Cincinnati. They are also named because the plaintiffs seek an interdistrict, metropolitan remedy. *See,* Second Amended Complaint (doc. # 204).

Since commencement of this present action, there have been numerous vigorously contested questions concerning what impact the previous Cincinnati desegregation litigation (*Deal* I and II, *supra*) would have on this case. Early in the proceedings, Judge Porter requested memoranda from the parties on the vitality and potential applicability of *Deal* to this case. *See, e. g.,* doc. # 18–20, 22. The defendants asserted the defense of res judicata, and thereafter, the plaintiffs filed a motion to determine the affirmative defense. (doc. # 53).

1. *Opinion Determining Affirmative Defense* (doc. # 56, Porter, J.)

On January 30, 1975, Judge Porter rendered his Opinion on plaintiffs' motion to determine the affirmative defense. (doc. # 56) Therein, he identified two main points to the question under consideration:

1. "whether facts regarding alleged segregative intent were actually litigated by the parties in *Deal* I and II . . . so as to bar relitigation of the Court's findings on gerrymandering, assignment of teachers, and other indicia of the existence of segregative intent." *Id.* at 1.

2. "whether *Deal* is still good law for the proposition that racial imbalance alone is no warrant for relief where such imbalance has not been caused by any act of discrimination on the part of defendants," *id.*, or stated differently, "whether or not *Deal* I and II are still good law for upholding the constitutionality of retaining neighborhood schools where racial imbalance has not been caused by any

discrimination on the part of school officials. *Id.*

Prior to any in-depth discussion, Judge Porter gave his short answers to the above questions:

"We conclude that matters relating to segregative intent were litigated in *Deal* and that the defense of *res judicata* may be asserted. As that suggests, we also conclude that the changes in the law since *Deal* have not been so drastic as to require the opposite result. In other words, *Deal* retains vitality because the law still provides that racial imbalance alone is not violative of the Constitution and that neighborhood school policy is a constitutionally permissible concept."

*Id.* at 2.

Having stated his conclusions at the outset, Judge Porter then proceeds to set forth his reasons therefor. He notes that defendants "do not suggest that *Deal* should act as an absolute bar to the prosecution of the instant dispute," *id.* at 7; rather, "they urge that this Court is precluded from considering 'any allegation of unconstitutional practice on the part of the defendant Board prior to September 30, 1968 . . .'" *Id., quoting,* doc. # 18, at 3–4. From this, he concludes that res judicata is not being asserted but that the defendants, including the state defendants, are asserting the applicability of collateral estoppel.

Reviewing *Deal*, Judge Porter concludes that "the facts regarding alleged segregative intent on the part of the Board was actually litigated . . . in *Deal*, and . . . Judge Peck necessarily reached determinations regarding *de jure* (as well as *de facto*) segregation." *Id.* at 10. Judge Porter then turns to plaintiffs' contention that collateral estoppel is inapplicable because of significant changes in the law intervening since the decision in *Deal*.

Specifically considering Sixth Circuit cases decided after *Deal*, e. g., *Higgins v. Grand Rapids Board of Education*, 508 F.2d 799 (6th Cir. 1974); *Oliver v. Michigan State Board of Education*, 508 F.2d 178 (6th Cir. 1974); *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), Judge Porter concludes that "the principle *Deal* holding remains good law—*i. e.*, school authorities have no strict constitutional duty to take affirmative action to relieve racial imbalance in the public schools where such imbalance is not caused by any act of discrimination on their part." *Id.* at 15. Therefore, "*Deal* has [not] become so 'obsolete or erroneous with time' as to render the rule of collateral estoppel inequitable and inapplicable." *Id.* He points out that the changes in the law regarding the burden of proof do not render *Deal* obsolete or erroneous because "a *prima facie* case is made out only in certain limited situations which were not present in *Deal*." *Id.* at 18. Even assuming that the *Deal* plaintiffs could have made out a *prima facie* case, Judge Porter expressed the opinion that "(based upon Judge Peck's findings) . . . any *prima facie* case in *Deal* was, or would have been, rebutted by defendants." *Id.* at 19.

After stating that the public policy considerations underlying collateral estoppel argue for its application in this case, Judge Porter addressed the question of party identity. *See, id.*, at 20. Consideration of this question was necessary to determine whether the state defendants, who were not parties in *Deal* would also be permitted to assert collateral estoppel as an affirmative defense. Noting that the modern trend is away from strict mutuality, *id.* at 21, Judge Porter decided that the state defendants may properly assert the defense. *Id.* at 22.

In the "Conclusion," Judge Porter explains the consequences of collateral estoppel as it applies to this case. In his view, application of the doctrine:

"(M)eans that the parties must accept Judge Peck's findings of fact, and that the parties will be prohibited from relitigating those factual determinations. We refer not only to the general finding rendered in *Deal* I (that racial imbalance in the Cincinnati Public Schools was not intentionally caused by the Board of Education), but also to the specific subsidiary findings of *Deal* II which we believe were actually litigated and necessarily determined in order to resolve the question of 'whether discrimination existed with re-

spect to specific schools and programs' ... and in order to resolve the larger overriding question of whether black pupils in the Cincinnati Public Schools were being denied equal protection of the law in contravention of the Fourteenth Amendment."

*Id.* at 23. The cut-off date was set at July 26, 1965, the date of the first decision by Judge Peck, since all of the findings made therein and in the Subsidiary Findings were based on evidence adduced prior to that date. *Id.* at 23–24.

In an order filed simultaneously with the above opinion, the Court agreed to make a certification pursuant to 28 U.S.C. § 1292(b), because it was of the "opinion that the *res judicata* issue involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." (doc. # 57, at 2) The Court of Appeals agreed to hear the interlocutory appeal.

### 2. Sixth Circuit-Interlocutory Appeal on Application of Collateral Estoppel

#### a. Opinion of the Court (Lively, J.)

On appeal, the order of the district court, as modified and interpreted, was affirmed. *Bronson v. Board of Education,* 525 F.2d 344 (6th Cir. 1975). Judge Lively delivered the opinion of the Court. Judge Phillips concurred in that opinion but filed a separate concurring opinion "to add ... observations only to emphasize what I understand to be the practical effects of our decision." 525 F.2d at 350. Judge Weick filed a dissenting opinion. *Id.* at 351.

At the outset, Judge Lively summarized the *Deal* litigation and then turned to a consideration of Judge Porter's opinion on the applicability of collateral estoppel. As to the district court's determination that, despite more recent decisions of the Supreme Court, *Deal* continued to have "vitality," the Court held that this "was clearly correct." *Id.* at 347. The Court also rejected plaintiffs' argument that "school cases are sui generis and involve national policy of the highest priority which requires that

res judicata and collateral estoppel at least be limited in their application." *Id.* at 348. Judge Lively states:

"We conclude that there has been no such change in the law since *Deal* as to prevent altogether the application of the doctrine of collateral estoppel to this case. Though there is a strong public policy against the continuation of racial segregation in public schools we do not believe that school desegregation cases are so different from other types of litigation that principles of res judicata and collateral estoppel should never be applied to them."

*Id.* at 349. Recognizing that neither doctrine should be rigidly applied and that their application may be limited or rejected in the face of overriding public policy or to avoid injustice, Judge Lively identifies the Court's task, on appeal:

"[W]e [must] determine the extent to which the doctrine of res judicata should be applied in order to accommodate two competing public policies and avoid manifest injustice."

*Id.* Initially, the Court notes its agreement with Judge Porter's determination that collateral estoppel should apply rather than res judicata. *Id.*

Acknowledging that adverse judgments in suits filed as "spurious class actions under former Rule 23, F.R.C.P., are not, according to authorities, binding on persons not parties to the action, the Court also stresses that "a public body should not be required to defend repeatedly against the *same* charge ... if it has been vindicated in an action brought by a ... group who validly and fairly represent those whose rights are alleged to have been infringed." *Id.* (Court's emphasis) The Court further notes that although the plaintiffs in the present case are not the same as those in *Deal,* "[t]here is a strong community of interests between the *Deal* plaintiffs and the *Bronson* plaintiffs. Consequently, the Court concludes:

"For the purposes of collateral estoppel, we do not consider the plaintiffs in the present action to be 'strangers' to the

*Deal* litigation. The proper balance between the public policy of requiring a finality to judgments which settle issues in litigation and that of preventing the denial of equal protection of the law to a generation which comes after such a judgment has been rendered may be achieved by applying the rule of 'issue preclusion.'"

*Id.* Application of the rule led the Court to affirm Judge Porter's Order which "forecloses the plaintiffs from showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents." *Id.*

Judge Lively then turns to matters which had not been specifically addressed by Judge Porter. Specifically, the discussion shifts to a consideration of "children attending the Cincinnati schools now who either were not born in 1965 or had not started to school." *Id.* Of these plaintiffs, the Court states, "Their claims were not in existence at the time of the judgment in *Deal* and could not have been extinguished by it," *id.*, and further:

"The complaint of such children and their parents of alleged wrongful acts subsequent to 1965 declares a different cause of action than that concluded by *Deal*, one to which estoppel does not apply." *Id.*

For these plaintiffs to establish their claims of present constitutional violations, Judge Lively states that they "must be permitted to show whether the *post-1965* actions, inactions and policies of the defendants have caused or contributed to the condition of which they complain." (Court's emphasis) *Id.* at 350. However, he also makes clear that this "evidence cannot be considered in a vacuum." Noting the Board's concession at oral argument that "plaintiffs may introduce evidence of conditions prior to July 26, 1965 'for background purposes,'" *id.*, and agreeing with their assertion that application of res judicata principles prevents the findings of violation prior to that date," the Court states:

"To the extent that the pre-1965 actions and policies of the Board and the conditions which existed on July 26, 1965 are relevant to a determination of the existence or non-existence of unlawful segregation at the times involved in this case, the district court may take judicial notice of facts stipulated or proved in *Deal*." *Id.*

Further considering evidentiary matters, the Court states its position on the admissibility of "new evidence of pre-*Deal* occurrences or conditions." *Id.* The district court is instructed to:

"[D]etermine in each instance whether or not such evidence is relevant to the inquiry in the present case, *i. e.*, does it shed light on the claim that minority pupils and their parents have been denied equal protection of the law by the defendants during the post-July 26, 1965 period . . . ."

*Id.*

Finally, Judge Lively addresses the district court's reference to "cumulative evidence of a possible constitutional violation." *Id.* He reaches two conclusions with respect thereto. First, that "[u]ltimate decision of the present case will necessarily require consideration of cumulative evidence." *Id.* Secondly, that consideration of such evidence is not foreclosed under the doctrine of issue preclusion." *Id.*

b. *Concurring Opinion* (Phillips, C. J.)

As mentioned previously, Chief Judge Phillips filed a separate concurring opinion. By way of prefatory comment, Judge Phillips states that he *does* concur in the opinion of Judge Lively, but that he writes to give his observations of the practical effects of what he refers to as "our decision." *Id.*

One of his observations is that plaintiffs are free to introduce evidence of post-*Deal* events and to argue for any interpretation they deem necessary to vindicate their Fourteenth Amendment rights. *Id.* As to pre-*Deal* evidence, he states that "the findings of fact based upon this evidence is binding on all *Bronson* plaintiffs." *Id.* at 351.

He expresses doubt that plaintiffs would uncover any new, relevant evidence that was not before the district court when it made its findings in *Deal*; however, he does speak briefly to that possibility. First, he states, "[t]o the extent that newly discovered evidence of pre-1965 occurrences is relevant in assessing the constitutionality of defendants' conduct after July 26, 1965, it may be admitted for that purpose." *Id..* He also suggests that a "more difficult question would be presented if the new evidence suggested that the findings in *Deal* were incorrect." *Id.*

Speaking of plaintiffs born or starting to school after the decision in *Deal*, Judge Phillips observes:

"If new evidence of pre-1965 events, substantially undercutting the *Deal* findings, is introduced on behalf of [these plaintiffs], the District Court may receive it and should consider whether some or all of those findings continue to be viable."

*Id.* Thus, to Judge Phillips, collateral estoppel limits plaintiffs only to the extent that they are precluded from relying *on the evidence presented in Deal* "to support findings different from or inconsistent with those actually made in that case." *Id.*

### c. *Dissenting Opinion* (Weick, J.)

Judge Weick filed a lengthy dissenting opinion. To him, "the only purpose of the present suit is to overturn the factual findings and judgment of Judge Peck." *Id.* at 352. Judge Weick would have affirmed Judge Porter without modification and held that the "Board can be held accountable only for any new acts and conduct subsequent to the cut off date of July 16 (sic), 1965, and not authorized or approved in *Deal*. *Id.* at 353. Because plaintiffs did not proceed under Rule 60(b), he would not permit introduction of any newly discovered evidence, and he is firmly opposed to the admission of evidence that would, in his view, have the effect of reopening and retrying any of the issues litigated in *Deal*.

The Sixth Circuit denied the Board's request for rehearing. 525 F.2d 360 (Weick, J., dissenting).

### 3. *Certification of Class; Interpretation of Sixth Circuit Decision* (doc. # 266, Porter, J.)

After the Sixth Circuit denied the petition for rehearing, and the cause was remanded to the district court, Judge Porter requested all counsel to submit memoranda concerning the meaning and scope of the Court of Appeals decision. Memoranda were submitted by the parties named in the suit at that time (the suburban defendants had not yet been named). *See* doc. # 70–72. After considering those memoranda, and later submissions on the class action certification issue, Judge Porter granted plaintiffs' motion to certify the class, and in his opinion thereon set forth his interpretation of the Sixth Circuit decision on collateral estoppel. (doc. # 266)

Judge Porter noted that the parties took divergent positions concerning the decision of the Sixth Circuit. He points out that "plaintiffs rely heavily on Judge Phillips' concurring 'observations' while defendants emphasize that Judge Weick's 'dissent' is closer to Judge Lively's opinion in terms of actual evidentiary impact . . . ." (doc. # 266, at 23). Judge Porter, however, finds "all this argument somewhat beside the point," because "*the opinion and mandate binding upon us in (sic) that of Judge Lively*—an opinion fully concurred in by Judge Phillips in spite of his additional 'observations.' " *Id.* (emphasis added) He, therefore, states, "We plan to adhere to Judge Lively's conclusions as best we can." *Id.* He then moves on to set forth what he believes those conclusions to be.

First, two separate groups are seen to exist within plaintiffs' class: 1. children who were attending Cincinnati schools on or prior to *Deal* who are presently attending such schools; and 2. children "either not born in 1965 or had not started to school" who are presently attending such schools. *Id.* For easy reference, sub-group 1. children were designated as pre-*Deal* plaintiffs; sub-group 2. were designated as post-*Deal* plaintiffs.

As to the pre-*Deal* plaintiffs, Judge Porter stated that the Court of Appeals "un-

qualifiedly affirmed" his order that the application of collateral estoppel fully applies. *Id.* at 24. Thus, pre-*Deal* plaintiffs were foreclosed from offering evidence which would contradict the *Deal* findings. These plaintiffs were limited to offering post-July 26, 1965 evidence, and newly discovered pre-1965 evidence to the extent relevant to show unconstitutional conduct after July 26, 1965. *Id.*

As to the post-*Deal* plaintiffs, Judge Porter stated that they are permitted to present pre-1965 evidence but, because of the application of res judicata principles, there could be no finding of a violation prior to July 26, 1965. Thus, post-*Deal* plaintiffs could present any post-*Deal* evidence. Additionally, they may introduce:

"any evidence of conditions prior to July 26, 1965 but solely as 'background evidence' of their 'claim that minority pupils and their parents have been denied equal protection of the law by the defendants *during the post July 26, 1965 period involved in this action.*'"

*Id.* at 25. Referring to the above category of evidence, Judge Porter states, "That is what we think the Court of Appeals intended by its reference to 'the cumulative evidence of a constitutional violation.'" *Id.*

He reiterates the position that "Res Judicata principles, however, prevent a finding of a constitutional violation by the Cincinnati defendants prior to July 26, 1965." *Id.* He then interjects the following statement:

"Whether such pre-*Deal* evidence would suggest that the findings in *Deal* were 'clearly erroneous' is a bridge we will not cross until we come to it."

*Id.*

### 4. *Plaintiffs' Intent to Attack Deal*

Subsequent to Judge Porter's Opinion certifying the class and setting forth his interpretation of the Sixth Circuit's decision, it has become "common knowledge" among counsel and Judge Porter that plaintiffs intend to launch an attack on *Deal* at the trial of the present suit. It is also clear that this intent has been tacitly, if not explicitly, approved by Judge Porter. The following excerpts from a Hearing on Cincinnati Defendants' Motion to Compel Answers to Interrogatories, held on December 17, 1979 (doc. # 428), provide illustrative support for these observations. Mr. Arnold, counsel for plaintiffs, arguing against the motion, stated to the Court:

"You'll issue your rulings, and then we'll proceed based upon those rulings however it is at that point. It seems to me and that is, of course, as I've talked about, whether or not it [evidence] is background or we want to make an offer of proof to argue to the trial judge and/or courts of appeals that the Deal record, the Deal decision's wrong, and so we'll present it in that fashion. (doc. # 418, at 16)

The Court comments in the course of the dialogue:

"I don't blame you for trying to retry Deal. I've got a job to do and you have to represent your clients; and as part of that it would help to get some court sometime to say Deal is wrong, but they haven't said that yet. They have said anything else but." (*Id.* at 17)

Mr. Arnold continues:

"I understand. But the Court does, the Court does understand that we're proceeding that way; and if we don't, if we don't make it by circumventing the Deal ruling, then we have an assault on the Deal ruling. Of course, that's what the issue is. And the record, I think we can't—at least we have one judge who contemplates we're entitled to make that record. I think Judge Lively contemplates it too. But clearly Judge Phillips does not, he contemplates—

. . . .

—that we're going to be able to make that record, and therefore from that record to make that argument." (*Id.* at 17)

The motion under consideration in the December 17, 1979 hearing concerned defendants' interrogatories which sought from plaintiffs a categorization or delineation of their pre-*Deal* evidence as "new" or "old." On March 28, 1980, Judge Porter granted the motion. (doc. # 447) In the opinion, Judge Porter reiterates plaintiffs' intent to attack *Deal* either by direct as-

sault or circumvention. He also makes the following observation:

> "Plaintiffs direct assault on *Deal* requires that they introduce evidence of pre-1965 conditions to establish that the *Deal* findings were incorrect. However, only new evidence of pre-1965 events may be used to overturn the *Deal* findings."

*Id.* at 2–3.

Also contained in this opinion is a reiteration of Judge Porter's interpretation of the Sixth Circuit's decision on collateral estoppel and the evidentiary effects of that decision. "The pre-*Deal* plaintiffs may only offer newly discovered pre-*Deal* evidence in *Bronson.* . . . The post-*Deal* plaintiffs, on the other hand, may offer any pre-*Deal* evidence, but such evidence may only be offered as background evidence of a post-*Deal* violation . . . ." *Id.* at 9. He states further that the post-*Deal* plaintiffs may present any pre-*Deal* evidence for " 'background purposes', regardless of whether the evidence is 'old' . . . or 'new.' " *Id.* at 9a. To support the point, Judge Porter quotes from Judge Phillips' concurring opinion. *Id., quoting* 525 F.2d at 351.

Judge Porter returns to the subject of the plaintiffs' attack on *Deal.* He states that "plaintiffs may only introduce 'new' pre-*Deal* evidence to attack the validity of Judge Peck's findings of fact in *Deal.*" *Id.* at 11. He also states that "pre-*Deal* plaintiffs may only offer pre-*Deal* evidence if such evidence is new or newly discovered;" that in order to directly assault *Deal,* they "must introduce evidence of pre-*Deal* conditions to establish that the *Deal* findings of fact were incorrect"—"new pre-*Deal* evidence." *Id.* Support for this position is again derived from Judge Phillips' concurring opinion. *See, Id.* at 11–12, *quoting* 525 F.2d at 351 (Phillips, C. J.). Since the plaintiffs had informed the Court on several occasions that they had a "significant amount of new pre-*Deal* evidence," *id.* at 13, Judge Porter concluded that defendants were entitled to have their interrogatories answered. *Id.*

By stipulation, the deadline for plaintiffs' response to defendants' interrogatories was extended to May 7, 1980. (doc. # 449). The Cincinnati defendants filed a Motion for Sanctions on July 11, 1980, contending that plaintiffs have failed to comply with the Court's order of March 28, 1980. (see doc. # 464). That motion is currently pending before the Court.*

5. *March 10, 1980 Preclusion Order Concerning Plaintiffs' Expert Witnesses*

To complete the historical overview, one final topic must be mentioned briefly. Specifically, reference must be made to Judge Porter's Order of March 10, 1980 (doc. # 440, in which a final date of April 25, 1980, was set for the depositions of plaintiffs' expert witnesses. To enforce the deadline, the Court entered the following order:

> "If the plaintiffs fail to furnish evidence (not otherwise privileged) in response to a proper deposition question, which evidence has been requested before April 25, 1980 and has not been supplied by that deadline, then the plaintiffs will be precluded from introducing or relying on such evidence at trial."

The only exceptions permitted are "under the most unusual circumstances and for good cause shown."

This Order is a culmination of events which occurred after passage of the October 1, 1979 deadline for deposition of these witnesses as set out in a discovery timetable on June 5, 1979. (doc. # 349) The problems attendant in getting these witnesses deposed can be traced in doc. # 422, 423, 424, 425, 428, and 438. Plaintiffs filed a Motion for Relief from the March 10 Order, but later withdrew same. (doc. # 443). Defendants have expressed their intent to rely on said Order. See, Letter of John Lloyd to Judge Porter, May 5, 1980 (concerning his response to Mr. Atkins' letter to Judge Porter of April 25, 1980). See also, doc. # 463,

---

* In a letter dated October 14, 1980, plaintiffs informed the Court that their Supplemental and Final Answers to the Fifth Set of Interrogatories would be submitted to the Cincinnati defendants on October 15. This Court has not yet received copies thereof, and thus, expresses no opinion as to whether these answers will moot the pending Motion for Sanctions.

Transcript of June 25, 1980, Steering Committee Conference, at 3–6, 11–15. Although given the opportunity to renew the Motion for Relief, *see, id.,* no relief has been requested. Thus, the preclusion order remains in full force and effect.

## II. INTERPRETATION OF THE SIXTH CIRCUIT DECISION ON COLLATERAL ESTOPPEL AND RELATED EVIDENTIARY MATTERS[1]

### A. *Impact and Application of Judge Phillips' Concurring Opinion*

As the historical overview indicates, the plaintiffs have made clear their intention to attack *Deal,* either by direct assault or circumvention. Support for the propriety of this attack is derived initially from Judge Phillips' concurring opinion in *Bronson v. Cincinnati Board of Education,* 525 F.2d 344, 351 (6th Cir. 1975) (Phillips, C. J., concurring). That the trial judge would entertain such an attack has been plaintiffs' understanding at least since Judge Porter's Opinion Certifying the Class in July of 1978. (doc. # 266, at 25). This is so despite Judge Porter's statement earlier in that same opinion that he intended to follow only the opinion of Judge Lively. *Id.* at 23.

This Court wishes to make clear that it fully agrees with, and intends to follow the position initially stated by Judge Porter that "the opinion and mandate binding upon us in (sic) that of Judge Lively—an opinion fully concurred in by Judge Phillips in spite of his additional 'observations.'" *Id.*

 The reasons for this position are those incorporated in the above quotation. First, concurring opinions have no legal effect, and thus, are in no way binding on any court. Secondly, and perhaps more importantly is Judge Phillips' own prefatory remark to his "observations,"—"*I concur in the opinion prepared by Judge Lively af-*firming the decision of the District Court . . . ." 525 F.2d at 351 (emphasis added)

This statement unequivocally establishes that Judge Lively's opinion is that of the Court, and is not intended to be considered as akin to a plurality opinion.

Since Judge Lively's opinion *is* the opinion of the Sixth Circuit, it is this Court's intention to look only to it for guidance on the application of collateral estoppel and related evidentiary questions. Therefore, if the Court subsequently determines that the Sixth Circuit decision remains binding, this Court will positively *not* indulge plaintiffs in an attack on Judge Peck's Findings of Fact, general or subsidiary, or Conclusions of Law in *Deal v. Cincinnati Board of Education, supra.*

### B. *Application of Collateral Estoppel to Bronson Plaintiffs: Judge Lively's Opinion*

The decision that Judge Phillips' opinion will have no practical or legal effect does not settle the questions concerning the impact of *Deal* and the application of collateral estoppel on this case. An interpretation of Judge Lively's opinion is obviously necessary. There appear to be some portions of that opinion which can, and have, given rise to divergent interpretations. Having reviewed and reflected upon that opinion at length, the following discussion sets forth this Court's interpretation of the Sixth Circuit decision regarding the application of collateral estoppel to the *Bronson* plaintiffs and its reasons therefor.

It is apparent from Judge Lively's opinion that the Sixth Circuit sought to strike the appropriate balance between competing public policy considerations. Judge Lively states:

"This appeal requires that we determine the extent to which the doctrine of res judicata should be applied in order to accommodate two competing public policies and avoid manifest injustice."

525 F.2d 349. A reading of the opinion and the authorities relied upon therein indicate

---

1. Nothing in this discussion should be read as expressing any view on the issue of whether there have been significant changes in the law since 1975 that would render the Sixth Circuit decision obsolete and collateral estoppel inapplicable. The conclusions expressed herein are based solely on the 1975 Sixth Circuit decision.

that the Sixth Circuit struck the balance in favor of the policies underlying collateral estoppel, while preserving the present plaintiffs' opportunity to prove that the Cincinnati School Board did something subsequent to July 26, 1965 that would constitute a constitutional violation. Having struck the balance, Judge Lively concludes that collateral estoppel precludes plaintiffs from relitigating the question of whether:

"[T]he defendants did, prior to July 26, 1965, act with a segregative intent or that the actions, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents."

*Id.* As will be discussed in greater detail herein, this conclusion applies equally to all plaintiffs, regardless of whether they were in school at the time *Deal* was decided or were either not born or not yet in school at that time.

The authorities that Judge Lively relied upon in the context of his discussion of the post-1965 plaintiffs shed considerable light on Judge Lively's position with respect to collateral estoppel, and also provide more than adequate support for the position that is currently under discussion. *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (6th Cir. 1967); and *United States v. General Electric Co.,* 358 F.Supp. 731 (S.D. N.Y.1973). Judge Lively cites *Lawlor, supra,* to support his conclusion that the claims of the children who were not born or not in school at the time of *Deal* were not in existence at the time of the judgment of *Deal,* and could not have been extinguished thereby. 525 F.2d at 349. He relies on *Cream Top Creamery, supra,* and *General Electric, supra,* for the determination that "[t]he complaint of such children and their parents of alleged continuing wrongful acts subsequent to 1965 declares a different cause of action than that concluded by *Deal,* one to which estoppel does not apply." *Id.* at 349.

These three authorities consider questions concerning collateral estoppel, res judicata, or both. None of them is factually similar to the case at bar; all three are anti-trust cases. However, there are several similarities between these three cases and the present one which render them applicable to the present case. In each, there was a prior litigation. In each, the plaintiffs complain of conduct which occurred subsequent to the judgments in the prior suit. Each makes reference to continuing conduct, but the starting point for the continuation is a date after the judgment in the prior suit. Finally, in each, the court determines that as to the conduct complained of subsequent to the judgment in the prior suit, collateral estoppel does not apply. With those similarities in mind, it is appropriate to discuss these cases briefly. They are central to an understanding of Judge Lively's position on collateral estoppel in this case, and to an understanding of this Court's position that under Judge Lively's Opinion, collateral estoppel applies *across the board* to all the *Bronson* plaintiffs.

*Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), was instituted by plaintiffs who were in the business of leasing advertising posters to motion picture exhibitors in the Philadelphia area. The posters, known in the trade as standard accessories, embodied copyrighted matter from the motion pictures being advertised. Prior to 1939, standard accessories could be purchased directly from the motion picture companies. Paramount in 1939, and thereafter, eight other producers granted to National Screen the exclusive right to manufacture and distribute various advertisements, including standard accessories. *Id.* at 323–24, 75 S.Ct. at 866–867.

In 1942, plaintiffs commenced a treble damage antitrust action against National and three producers who had already granted exclusive licenses to National. The complaint alleged that defendants had conspired to establish a monopoly in the distribution of standard accessories by means of exclusive licenses and that plaintiffs' businesses had been injured as a result. The complaint further alleged that National was then negotiating with other major producers to procure similar licenses. Plaintiffs sought both damages and injunctive relief. *Id.* at 324, 75 S.Ct. at 866–867.

In 1943, prior to any trial, the suit was settled. In the settlement, National Screen agreed to furnish plaintiffs with all standard accessories distributed by it pursuant to its exclusive license agreements with producers. The settlement also included such agreements which might be executed in the future. In exchange, plaintiffs agreed to drop the suit and they also agreed to pay National Screen specified prices for the materials. *Id.*

In 1949, while the renewed sublicense was still in force, the same plaintiffs brought an action, again seeking treble damages and injunctive relief. The named defendants were National Screen, the three producers who were also named in the previous suit, and five producers who licensed National Screen subsequent to the dismissal of the 1942 suit. The complaint alleged that the 1943 settlement was merely a device used by defendants to perpetuate their conspiracy and monopoly, and that the five additional producers had joined the conspiracy since 1943. Plaintiffs also alleged that National Screen had been deliberately slow and erratic in delivering advertising material under the sublicense in an effort to destroy the plaintiffs' businesses. Damages were sought for resulting injuries from August 16, 1943 "—*in other words, for a period beginning several months after the dismissal of the 1942 complaint.*" *Id.* at 325, 75 S.Ct. at 867 (emphasis added).

In 1953, before any trial was conducted, the defendants moved to dismiss on the ground that the 1943 judgment was res judicata. *Id.* The court of appeals affirmed the district court's granting of the motion. The Supreme Court granted certiorari because "of the importance of the question . . . in the enforcement of the federal antitrust laws." *Id.* at 326, 75 S.Ct. at 867.

The Court agreed that there was no issue of collateral estoppel in the case since the prior suit never reached trial; consequently, no issues were litigated. The Court also noted that the 1943 judgment dismissing the former suit "with prejudice" barred a later suit on the same cause of action. Addressing the contention that the second suit was the same cause of action, the Court stated, "That both suits involved 'essentially the same course of wrongful conduct' is not decisive." *Id.* at 327, 75 S.Ct. at 868. The Court explained:

"Such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action. And so it is here. *The conduct presently complained of was all subsequent to the 1943 judgment.* In addition, there are new antitrust violations alleged here . . . not present in the former action. *While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even exist and which could not possibly have been sued upon in the previous case. . .* Under these circumstances, whether the defendants' conduct be regarded as a series of individual torts or as *one continuing tort* [since 1943], the 1943 judgment does not constitute a bar to the instant suit." *Id.* at 327–28, 75 S.Ct. at 868–869. (footnote omitted) (emphasis added).

The Court rejected all the arguments that defendants could muster for their position that res judicata should apply. One argument was rejected because it "would in effect confer on them a partial immunity from civil liability for future violations." *Id.* at 329, 75 S.Ct. at 869. As to the five producers named in the second suit but not involved in the first, the Court determined that they could not be considered privies "since they did not even enter the alleged conspiracy until after the judgment on which they now rely." *Id.* at 329–30, 75 S.Ct. at 869. The Court, therefore, concluded that the subsequent suit was not barred either by res judicata or collateral estoppel.

The opinion of the court in *Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (6th Cir. 1967) was written by Judge Phillips. This antitrust suit was commenced in 1959 by plaintiff milk distributors against defendant milk distributors. The amended complaint alleged that continuously since about January 1, 1955, there had been a conspiracy existing between the various defendants, which was a restraint of trade

and commerce affecting the purchase, distribution and sale of dairy products between the states of Indiana and Kentucky. The second amended complaint alleged that from June 1, 1953, up to the filing date of February 2, 1965, the Dean Milk Companies had discriminated systematically in price among their customers in the sale of dairy products which substantially lessened competition and tended to create a monopoly.

On February 2, 1965, the district court dismissed Kroger and A & P from the suit for want of prosecution. Dean Milk moved for summary judgment on the basis of a prior dismissal with prejudice in a state court action. The district court granted the motion, holding that the dismissal with prejudice in the state action was tantamount to a trial and final judgment, and, therefore, res judicata. The Sixth Circuit reversed. The issue identified on appeal was "the effect to be given to a prior dismissal with prejudice of a State Court action in a subsequent antitrust suit in a Federal District Court." *Id.* at 361.

Addressing the defendants' contention that collateral estoppel should be applied, the Court stated, "[T]he doctrine of collateral estoppel is not applicable in the instant case where there was no findings of fact and no adjudication of the case on its merits in the State Court action." *Id.* at 363. The Court continued:

"Undoubtedly, the 1958 judgment dismissing the *Cherokee* suit with prejudice bars a later suit on the same cause of action. However, since that judgment was unaccompanied by findings of fact and there was no decision on the merits, *the judgment does not bind the parties on any issue which might arise in a cause of action involving alleged continuing wrongful acts subsequent to the dismissal of the Cherokee case.* Therefore, no question of collateral estoppel is involved in this suit."

*Id.* (emphasis added) Support for the above proposition is drawn from *Lawlor, supra.*

Judge Phillips also concludes that res judicata was inapplicable. One of the reasons for this conclusion was that Congress gave the federal courts exclusive jurisdiction over wrongs committed under the antitrust act. Another reason was articulated in a rather cursory fashion:

"Here the amended complaint in the *Cream Top* case charges that Dean made unlawful sales at discriminatory prices . . . beginning 1952 and continuing up to the date of the second amended complaint in 1964. *At least insofar as the complaint alleges violation since the dismissal of the Cherokee case,* the judgment in *that case cannot be given the effect of extinguishing a claim which arose subsequent to that judgment.*"

*Id. Lawlor* is again cited as authority.

The third case relied on by Judge Lively in *Bronson* is *United States v. General Electric Co.,* 358 F.Supp. 731 (S.D.N.Y.1973). The government alleged that General Electric's system of marketing "large lamps," of which it was a leading manufacturer, constituted *per se* violations of the Sherman Antitrust Act. Through a consignment system of marketing which it had used for more than 60 years, General Electric set the price at which such lamps were to be sold by its agents. The central issue in the case concerned the viability and effect of two prior suits between the government and General Electric in which the government had unsuccessfully attacked virtually the same marketing system. The first case was in 1926; the second in 1949.

The Court held that because of its 1964 decision in *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, the prior cases in which General Electric had prevailed were no longer good law. *Id.* at 738. The Court then addressed General Electric's res judicata defense. At the outset, the Court stated its understanding of the distinctions between res judicata and collateral estoppel. It explained res judicata: "When a second suit between the same parties is brought on the same cause of action, if the prior judgment was on the merits it is ordinarily a complete bar to the second action." *Id.* at 738. The Court made the following statements about collateral estoppel:

"[I]f the second suit between the same parties is on a different cause of action, only those issues actually litigated and determined in the first action are conclusive in the second ... Moreover, collateral estoppel is confined to situations where the matter raised in the second suit is identical in all respects with that determined in the prior action and where the controlling facts and applicable legal principles remain unchanged."

*Id.* (citations omitted).

Ultimately, the Court rejected General Electric's contentions that this suit was barred either by res judicata or collateral estoppel. First, the Court discussed General Electric's res judicata contentions. The parties had stipulated that General Electric's marketing system was not substantially different from the one that had been challenged in the prior suits. From that General Electric argued that the present case was being sued upon the same cause of action for which judgment had been rendered in its favor, and against the government in the prior suits, and that the doctrine of res judicata created an absolute bar to a subsequent suit between the same parties upon the same cause of action. *Id.* The government, on the other hand, argued that:

"Where, as here, a subsequent antitrust suit covers conduct during *a period subsequent to the former judgment*, and the law has changed as to such an important matter of governmental policy as the enforcement of the antitrust laws, the subsequent suit is not barred by the doctrine of res judicata, however it may be defined or applied." *Id.* at 739. (emphasis added)

The Court reiterated that there had been a significant change in the law, and stated that whether this change foreclosed the defenses of res judicata or collateral estoppel was "not an easy question." *Id.* Before discussing *Lawlor v. National Screen, supra,* the Court stated its initial conclusion:

"The res judicata rule that a judgment on the merits is a bar to a subsequent action between the same parties applies *only* where the subsequent action is upon the same cause of action. In the case at bar,

... the cause of action sued upon is not the same but is different from the causes of action sued upon in the prior *General Electric* cases. The doctrine of res judicata as an absolute bar therefore does not apply here."

*Id.* at 739.

General Electric sought to distinguish *Lawlor* "upon the ground that in the second suit there were also additional allegations as to some new acts which the defendants had allegedly committed since the earlier judgment." *Id.* at 740. The Court expressed the view that this was "merely an additional reason why res judicata did not apply." *Id.* The Court continued:

"It did not limit the Court's holding that a suit based upon *a course of wrongful conduct occurring subsequent to the judgment in the prior suit is not* based on *the same* but on a different cause of action." *Id.* (emphasis added)

The Court points out that this reading is in accord with numerous other authorities, one of which is *Cream Top Creamery, supra.* The Court then states:

"*In the case at bar,* as in *Lawlor, the course of conduct complained of occurred subsequent to the judgments in the prior suits.* The same public policy considerations against giving a defendant immunity—in fact, perpetual immunity—from liability, for such violations in the future is present here. Here, as in *Lawlor,* while the course of conduct alleged may be a continuing one, the cause of action is not the same but different from that on which the judgments in the 1926 and 1949 actions were rendered." *Id.* (emphasis added)

After concluding that the case was not governed by res judicata, the Court turned to collateral estoppel considerations. Essentially, the Court held that the principles of collateral estoppel did not apply because the decisional law had significantly changed since the prior judgments were rendered. *Id.* at 741. Because of that change, relitigation in the subsequent suits was not precluded by collateral estoppel. The Court stated that when there has been a signifi-

cant change such as had occurred here, "collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" *Id.* at 741, *quoting, Commissioner v. Sunnen,* 333 U.S. 591, 599–600, 68 S.Ct. 715, 720–721, 92 L.Ed. 898 (1947). Quoting further from *Sunnen,* the Court stated that before collateral estoppel could be invoked, " 'the legal matter raised in the second proceeding must involve the *same set of events* or documents and *ithe same bundle of legal principles* that contributed to the rendering of the first judgment.'" *Id.* at 741, 333 U.S. 601–02, 68 S.Ct. 721 (emphasis added).

The point which the Court stressed in determining that collateral estoppel should not apply in this case, where the prior judgments were no longer good law, was that an application of the doctrine would, in effect, grant the defendant perpetual immunity and cause injustice. "[I]t must be remembered that the use of these doctrines [res judicata and collateral estoppel] can cloak a party in perpetual immunity and thus *possibly protect conduct lasting long past the prior judgment* —conduct that the law may grow to abhor." *Id.* at 742, *quoting, Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.,* 421 F.2d 1313, 1316 (5th Cir. 1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971) (emphasis added). Concluding this section of the opinion, the Court made clear that General Electric should not be subjected to treble damages arising out of its reliance on the previous decisions in its favor. The remedy was to have only a prospective effect. *Id.* at 742.

To summarize, in all three cases, the courts determined that the case currently before them stated a different cause of action than the one previously adjudicated. For that reason, res judicata, which precludes subsequent litigation of the same cause of action, did not apply. In *Lawlor* and *Cream Top,* the courts determined that collateral estoppel was also inapplicable, primarily because the prior judgments in both cases were dismissals with prejudice,

and, therefore, there had been no litigation of issues and no findings with respect to any issues. In those cases, collateral estoppel could not be applied since the doctrine only prevents relitigation of previously litigated issues—those actually litigated. In *General Electric,* there had been at least two prior suits between the same parties, and the issue of whether General Electric's marketing systems violated antitrust provisions had been litigated (at least in the 1926 suit). Collateral estoppel was held to be inapplicable in the subsequent suit because the Supreme Court's 1964 decision in *Simpson* effectively overruled its previous decision in 1926, which had been used as the basis for the determination in the 1949 decision. The doctrine was held inapplicable because the *Simpson* decision had intervened and changed the legal atmosphere in a significant way. Thus, the most recent suit against General Electric *did not involve the same legal principles* that had contributed to the first judgment in 1926, or to the determination in General Electric's favor in 1949.

In *Bronson,* both Judge Porter and Judge Lively rejected the contention that res judicata should apply. By doing this, they necessarily rejected the notion that the present plaintiffs are bringing the same cause of action that had been brought in *Deal.* That conclusion is completely consistent with the cases discussed above. As in *Lawlor, supra,* 349 U.S. at 327, 75 S.Ct. at 868, "that both suits involved 'essentially the same course of wrongful conduct' is not decisive."

This conclusion is also sound under the original complaint, which was before the Sixth Circuit, and under the Second Amended Complaint as well, which is before this Court. All of the specific allegations in those complaints refer to actions, inactions or conduct that occurred *after* the *Deal* decision. The earliest date referred to in that complaint is 1968 (see para. 21); most of the allegations concern activities allegedly occurring in the 1970s. Because of this, it is logical to conclude that res judicata might have barred litigation on claims allegedly occurring prior to July 26, 1965; however, the 1965 decision "cannot be

given the effect of extinguishing claims which did not even exist and which could not possibly have been sued upon in the previous case." *Lawlor, supra,* at 327, 75 S.Ct. at 868. *See also, Cream Top Creamery, supra* at 363; *General Electric, supra* at 739.

It should also be noted that there was no need to distinguish between pre-*Deal* and post-*Deal* plaintiffs when considering the application of res judicata. Res judicata is inapplicable to plaintiffs who were in school at the time *Deal* was decided; it is, likewise, inapplicable to plaintiffs who were not in school or not yet born at the time of the *Deal* decision. The reason therefor is that the cause of action stated by the *Bronson* plaintiffs (pre- or post-*Deal*), while perhaps similar to the one presented by the *Deal* plaintiffs is not the same—the *Deal* plaintiffs stated a cause of action based on allegations of occurrences prior to July 26, 1965; the *Bronson* plaintiffs state a cause of action based on occurrences subsequent to July 26, 1965, which simply could not have existed before July 26, 1965. Thus, it is this Court's position that Judge Lively held that the doctrine of res judicata is inapplicable as to the *Bronson* plaintiffs, based on their original Complaint and also under their Second Amended Complaint. This is consistent with the authorities relied upon by Judge Lively, and is consistent with this Court's understanding of res judicata.

Of course, the question remains as to the application of collateral estoppel as envisioned by Judge Lively's opinion. He states:

"The district court's order forecloses the plaintiffs from showing that the defendants did, prior to July 26, 1965, act with a segregative intent or that the action, inactions or policies of the Board prior to that date violated the constitutional rights of minority pupils or their parents. These issues have been decided and under the issue preclusion application of collateral estoppel may not be reopened."

525 F.2d at 349. However, in the remainder of that last full paragraph on page 349

2. See, Part C, "Application of Collateral Estoppel to State and Suburban Defendants, *infra.*

of the opinion, Judge Lively seems to make a distinction between plaintiffs who were not born or not in school when *Deal* was decided and those who were in school at that time. This has resulted in much confusion and debate and has influenced many of the rulings made by Judge Porter.

Additionally, the language employed by Judge Lively regarding "post-*Deal*" plaintiffs is "res judicata" language, that is, references are made to these plaintiffs' "claims" and "cause of action." This is troublesome because the conclusions drawn on the basis of this language relate to collateral estoppel—issue preclusion, and not to res judicata—claim preclusion.

In order to resolve this confusion, it is helpful to refer back to the cases relied upon by Judge Lively in this paragraph. *E. g., Lawlor, supra; Cream Top Creamery, supra; General Electric, supra.* Consideration of *this* paragraph in light of those decisions, read in their entirety, leads this Court to the following conclusions (provided this Court determines that the Sixth Circuit decision applies):

1. Collateral estoppel would bar relitigation of any of the issues litigated in *Deal* and would preclude *all Bronson* plaintiffs from attacking Judge Peck's findings and conclusions. To the extent that plaintiffs' Second Amended Complaint may contain implicit or explicit allegations of unconstitutional conduct by the Cincinnati Board of Education and its members occurring prior to July 26, 1965, [which does not relate to an alleged interdistrict violation or effect,[2]] evidence adduced of same will not be received for the purpose of establishing such a violation.

2. Collateral estoppel does not apply to bar litigation of issues based on allegations of misconduct by the Cincinnati defendants that occurred subsequent to July 26, 1965. Those issues could not have been litigated in *Deal* by virtue of the fact that the conduct complained of had not yet occurred as of July 26, 1965.

3. With respect to the post-1965 allegations raised in the Second Amended Complaint, there is no distinction between plaintiffs who were in school at the time of *Deal* and those who were either not born or not yet in school at that time. In other words, the perimeters of this litigation are defined by the allegations of the Second Amended Complaint. On the basis of that complaint, all plaintiffs are "post-*Deal* plaintiffs" because the alleged wrongs for which they seek redress *all* occurred in the post-*Deal* era.

Support for these conclusions is, as indicated, derived from the cases cited by Judge Lively. In all three of those cases, the courts rejected arguments that collateral estoppel applied. In *Lawlor* and *Cream Top Creamery*, this decision was reached because the prior judgments had been dismissals with prejudice; thus, no issues were litigated and no findings were made. If these two cases stand for the proposition that collateral estoppel *does not* apply in a subsequent litigation involving the same parties where no issues were litigated in the first suit, then it is logical to assume that the converse also holds true. The converse to that proposition is that where issues were litigated in a prior suit and final judgment was rendered thereon, collateral estoppel *does apply* to bar relitigation of those issues, where the second suit involved the same parties.

Given the above, Judge Lively's unqualified statement that collateral estoppel precludes relitigation of the issues in *Deal*, can be interpreted as a converse application of *Lawlor* and *Cream Top Creamery*. Implicit is Judge Lively's determination that the present case is unlike those two since the issues concerning the alleged unconstitutional conduct of the Cincinnati defendants prior to July 26, 1965, were litigated in *Deal*. Further, since the *Bronson* plaintiffs are not "strangers" to the *Deal* litigation and since "[t]here is a strong community of interests between the *Deal* plaintiffs and the *Bronson* plaintiffs," 525 F.2d at 349 (emphasis added), this Court believes that Judge Lively intended collateral estoppel to apply to *all Bronson* plaintiffs in an across-the-board fashion.

This position is also consistent with *General Electric*, where the court concluded that collateral estoppel could not be applied, between the same parties to the former suits, because of a significant change in the law between the prior judgments and the present suit. The change in the law necessarily required the conclusion that the prior suits were determined under legal principles that were no longer applicable. The converse is again equally true, that is, where there is no change in the law, both the former and the later suit will be determined under the same legal principles; therefore, collateral estoppel should apply.[3]

The crucial difference between *General Electric* and the present case is that Judge Lively concluded that *no* significant change in the law had intervened between the *Deal* decision and the present time. This determination distinguishes *General Electric* from the present case. Consequently, collateral estoppel *would* apply in this case where it did not in *General Electric*, if the Sixth Circuit decision retains vitality.

It is helpful to recall that in *General Electric*, the court stated that before collateral estoppel could be invoked, the "legal matter in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment." 358 F.Supp. at 741. Applying this to determine whether the present plaintiffs should be precluded from relitigating issues determined in *Deal*, it is readily apparent that collateral estoppel would be properly invoked to thwart any attempt by the *Bronson* plaintiffs to relitigate *Deal*. In order to successfully challenge the Cincinnati defendants' action, inactions or other conduct pre-*Deal*, the second proceeding

---

**3.** Again, it should be stressed that this conclusion relates to the status of the law as of 1975. *See supra* note 1.

would invariably involve the same set of events or documents, no matter how they are re-arranged or reshuffled. Further, if the law has not significantly changed in the interim, the second proceeding would also involve the same "bundle of legal principles" that contributed to the first judgment. The only reasonable conclusion is that, under these circumstances, collateral estoppel applies to *all* plaintiffs in the present suit.

These cases support this Court's conclusion that Judge Lively spoke of issue preclusion without differentiating between pre- and post-*Deal* plaintiffs because he meant for collateral estoppel to apply to *all* plaintiffs. A careful search of the opinion will reveal that whenever Judge Lively stated what the plaintiffs could not do, i. e., relitigate *Deal*, he never categorizes plaintiffs into one group or another. "Plaintiffs" is always unqualified. This, along with the reasons set forth above, lead this Court to adopt the position that no qualification was intended and that under Judge Lively's Opinion *all Bronson* plaintiffs are collaterally estopped from relitigating claims that refer to the pre-*Deal* era.

It is imperative to note that the above conclusion does not mean that plaintiffs would be foreclosed from litigating any issues that concern alleged unconstitutional conduct on the part of the Cincinnati defendants occurring after July 26, 1965. On the contrary, in the last full paragraph of page 349, where Judge Lively makes a distinction between so-called pre-*Deal* and post-*Deal* plaintiffs, he stressed that collateral estoppel does not apply to claims "not in existence at the time of the judgment in *Deal* or to the "complaint . . . of alleged continuing wrongful acts subsequent to 1965 . . . ." What Judge Lively did not make clear, and what this Court believes needs to be made clear, is that with respect

to the claims of wrongs occurring after *Deal, all Bronson* plaintiffs fall into the category of post-*Deal* plaintiffs, regardless of when they entered the Cincinnati public schools. An interpretation of Judge Lively's opinion which, in effect, says that *Bronson* plaintiffs who were in school at the time of *Deal* are estopped from litigating issues which did not and could not exist when *Deal* was decided, defies logic.[4] Such an interpretation would require this Court to find Judge Lively's opinion to be irreconcilably inconsistent, which this Court declines to do in light of the otherwise sound analysis of application of collateral estoppel principles.

*Lawlor, supra, Cream Top Creamery, supra*, and *General Electric, supra*, again support this Court's interpretation. Plaintiffs in those cases were not collaterally estopped from litigating issues premised on allegations concerning continuing wrongs which commenced after the date of the prior suits. In the present case, as in *Lawlor* and *Cream Top Creamery*, the plaintiffs' complaint contains allegations that could not have existed when the prior suit was initiated or resolved. Here, as there, the wrongs alleged do not refer to something that began before the first suit and continued forward in time to the present. Plainly, the doctrine of collateral estoppel cannot be applied so broadly as to preclude litigation of issues that simply did not exist when judgment was entered in the prior suit. Nor can it be applied so broadly as to preclude litigation of these issues when raised on behalf of plaintiffs who may have been in school when *Deal* was decided.

Application of the doctrine in that manner would be tantamount to granting the Cincinnati defendants a partial immunity. Although the Court expresses no opinion whatever on the merits of plaintiffs' case,

---

**4.** This Court has some doubt as to the actual existence of so called pre-*Deal* plaintiffs in the present suit. Logistics argue against their existence since at the time the class was certified (July, 1978, doc. # 266), thirteen years had elapsed since the *Deal* decision. Normally, a student spends no more than thirteen (13) years in the public school system if the system is operating a kindergarten through twelfth grade program, which Cincinnati apparently does. However, since some students may have remained in the system longer than the norm, because of failure or the like, this Court will assume that the class does contain at least a limited number of pre-*Deal* plaintiffs.

there is nothing in logic or reason to justify the assumption that a party exonerated from wrongdoing at a certain point in time will forever refrain from wrongdoing in the future. For example, and only for purposes of illustration, it is conceivable that the Cincinnati Board of Education took an action on July 27, 1965, one day after the judgment in *Deal,* and that action may have been taken with segregative intent. That wrong may be of a continuing nature, continuing in fact up to the present time, but that action requires no referencing back to the pre-*Deal* era. The action or decision may be looked upon as a continuing wrong or a series of wrongs. Regardless of the way it is viewed, the starting point is the date of the *Deal* decision or any day thereafter. It would be patently unfair to any *Bronson* plaintiffs who might have been in the Cincinnati school system at the time of *Deal* for this Court to assume that since Judge Peck found no violation as of July 26, 1965, the Cincinnati defendants would thereafter make all decisions free from the taint of segregative intent. Thus, with respect to issues based on the Cincinnati defendants' actions, inactions or policies occurring subsequent to July 26, 1965, all *Bronson* plaintiffs would be "post-*Deal*" plaintiffs and collateral estoppel would simply be inapplicable to these issues.

## C. *Application of Collateral Estoppel to State and Suburban Defendants*

The foregoing has been confined to a discussion of collateral estoppel as it relates to the Cincinnati defendants and the *Bronson* plaintiffs. Before proceeding to a discussion of related evidentiary matters, it is necessary to address what, if any effect, Judge Lively's Opinion on collateral estoppel would have on the plaintiffs' case regarding allegations of an interdistrict violation, that is, to what extent may the suburban defendants assert collateral estoppel an affirmative defense.

On December 8, 1978, Judge Porter rendered an Opinion concerning a motion by plaintiffs to compel discovery from the Cincinnati defendants. (doc. # 307). Therein, Judge Porter identified three theories deriving from the "interdistrict violation

and/or effect language of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). These are:

"1) Liability based on an alleged segregative act in the Cincinnati City School District which causes a 'significant segregative effect' in one or more of the suburban school districts.

2) Liability based on an alleged segregative act in one or more of the suburban school districts which causes a 'significant segregative effect' in the Cincinnati City School District. (footnote omitted)

3) Liability based upon an alleged segregative act occurring between the Cincinnati City School District and one or more of the suburban school districts (e. g., boundary lines drawn with segregative intent, etc.)" (citation and footnote omitted). (doc. # 307, at 11–12)

With respect to the first theory, Judge Porter stated:

"Obviously, if plaintiffs are generally precluded from asserting that the Cincinnati defendants committed segregative acts or acted with segregative intent prior to July 26, 1965, there cannot be an 'interdistrict effect' in the school districts of any of the suburban defendants based on such acts. *To that extent, the suburban defendants, we think, would be entitled to rely on the findings of fact and conclusions of law in Deal in the same manner as the state defendants.*" See doc. 56, at 21–22.

*Id.* at 12–13. He further states, "Thus, the collateral estoppel effect of the *Deal* case on this aspect of the issue of 'interdistrict violations and effects' is the same as the effect of the *Deal* case on the 'intradistrict' aspect of this case." *Id.* at 13.

■ This Court agrees with Judge Porter that under Judge Lively's Opinion the state and suburban defendants would be entitled to rely on the findings of fact and conclusions of law in *Deal.* Thus, with respect to the state defendants, there could be no findings of liability against them in the present case on the basis of actions, inac-

tions or policies of the Cincinnati defendants on or before July 26, 1965.

What this means for the suburban defendants is that there could be no finding in this case that any segregative act by the Cincinnati City School District, prior to July 26, 1965, caused a significant segregative effect in one or more of the suburban school districts. No such findings could be made for the simple reason that *Deal* established that the Cincinnati defendants did not commit any segregative act for that school district prior to July 26, 1965. Thus, because of *Deal* and Judge Lively's Opinion on the application of collateral estoppel, the plaintiffs would be foreclosed from relying on the first theory in *Milliken, supra*, as a basis of an interdistrict violation and/or effect prior to July 26, 1965. Liability of the suburban defendants under the first theory would have to be established, if at all, on the basis of segregative acts committed by the Cincinnati City School District after the date of *Deal.*

With respect to the second and third theory, Judge Porter states, "Plaintiffs are quite correct that these issues were not raised or litigated in the *Tina Deal* case . . . [t]hus, plaintiffs are also correct in their assertion that 'the principles of *res judicata*, collateral estoppel and issue preclusion do not apply' to those theories." *Id.* at 14. He, therefore, concludes that "the *Deal* case has no 'issue preclusion' effects on plaintiffs' assertion of theories two and three . . . ." *Id.*

■ This Court is also in total agreement with Judge Porter's conclusions as to theories two and three. Issues concerning segregative acts by the suburban school districts and issues concerning alleged segregative acts between the Cincinnati defendants and the suburban defendants were not raised or litigated in *Deal.* For that reason, the doctrine of collateral estoppel is not applicable to these matters, and plaintiffs are not limited to proving these allegations only in the post-*Deal* era. Consequently, plaintiffs are free to attempt to prove, without time constraint, either: 1) that the suburban defendants committed segregative acts within their school districts which caused a "significant segregative effect" in the Cincinnati City School District or 2) that there were segregative acts occurring between the Cincinnati City School District and one or more of the suburban school districts.

### D. Admissibility of Pre-Deal Evidence

Assuming that plaintiffs are limited to proving that the Cincinnati defendants violated their constitutional rights by conduct, actions, etc., taken after July 26, 1965, and assuming further that all plaintiffs are post-*Deal* plaintiffs for purposes of proving same, the questions regarding the use of pre-*Deal* evidence, which have generated such divergent positions, come into proper focus and can be resolved with relative dispatch.

#### 1. "Old" Pre-Deal Evidence

Judge Lively states that "plaintiffs must be permitted to show whether the post-1965 actions, inactions or policies of the defendants have caused or contributed to the conditions of which they complain." 525 F.2d at 350. He also states that "this evidence cannot be considered in a vacuum . . . ." *Id.* To alleviate this possibility, he notes that defendants recognized at oral argument that "the plaintiffs may introduce evidence of conditions prior to July 26, 1965 'for background purposes,'" but that such evidence cannot be made the basis of a finding of a pre-1965 violation. *Id.* He then states:

"*To the extent* that the pre-1965 actions and policies of the Board and the conditions which existed on July 26, 1965 are *relevant* to a determination of the existence or non-existence of unlawful segregation at the times involved in this case, the district court may take judicial notice of facts stipulated or proven in *Deal.*"

*Id.* (emphasis added)

■ This Court interprets the above mandate to mean that it should judicially notice "the facts stipulated or proven in *Deal,*" and that evidence introduced in *Deal* is admissible if, and only if, it is "relevant to a determination . . . of unlawful segre-

gation at the times involved in this case," which is after July 26, 1965. The stress which has previously been placed on defendants' statement during oral argument referring to the use of pre-1965 evidence for "background purposes" is, in this Court's opinion, misplaced. The standard of admissibility for "old" pre-*Deal* evidence is the one set by Judge Lively; that standard is relevance, not background. This is not to say that the two standards are not compatible; on the contrary, it seems entirely probable that evidence offered for purposes of background is admissible because it is relevant. It may well be that the terms were meant to be read interchangeably or that it was assumed that background evidence would be relevant for purposes of this litigation. The point which this Court wishes to make is that it would rely on Judge Lively's instructions rather than on the statement made by defense counsel during oral argument. On the basis of those instructions, the Court makes the following determinations (again, assuming the vitality of the Sixth Circuit's Opinion in *Bronson*):

1. This Court should judicially notice the facts stipulated or proven in *Deal* —that is, the general and subsidiary findings of Judge Peck and the facts stipulated in the *Deal* record.

2. Evidence admitted in *Deal* is admissible in the present case to the extent that it is relevant to show the existence or non-existence of post-July 26, 1965 violations committed by the Cincinnati defendants.

3. Facts stipulated or proven in *Deal* are admissible to the extent that they will facilitate an understanding of testimony in this case.

4. Evidence admitted in *Deal* which does not provide background or which is not relevant (as those terms may not be co-extensive) is not admissible.

5. Except by way of proffer, no evidence admitted in *Deal* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

6. No finding should be made on the basis of evidence admitted in *Deal* and admitted in the present case that the Cincinnati defendants violated plaintiffs' constitutional rights prior to July 26, 1965.

7. The above restrictions would not apply to plaintiffs' allegations concerning interdistrict violations, which were neither raised nor litigated in *Deal*.

### 2. *"New" Pre-Deal Evidence*

Judge Lively set forth the following standard of admissibility for "new evidence of pre-*Deal* occurrences or conditions":

"[T]he district court will determine in each instance whether or not such evidence is relevant to the inquiry in the present case, i. e., does it shed light on the claim that minority pupils and their parents have been denied equal protection of the law by the defendants during the post-July 26, 1965 period involved in this action?"

525 F.2d at 350. (footnote omitted) Again, the standard is one of relevance. This language mirrors the language used by Judge Lively several paragraphs earlier when he discusses the standard of admissibility for evidence introduced in *Deal*. The two passages need only be compared to reach the conclusion that the standard with regard to "new" pre-*Deal* evidence is exactly the same as that which applies to "old" pre-*Deal* evidence. In this Court's opinion, pre-*Deal* evidence, regardless of whether it was introduced in *Deal* or not should be received if it has "any tendency to make the existence of any fact that is of consequence to [the] determination of the action more probable or less probable than it would be without the evidence." Rule 401, F.R.E. Since the standards are the same, so too are the limitations which would be placed on the admissibility of pre-*Deal* evidence not admitted in *Deal*. Therefore, under Judge Lively's Opinion, the Court makes the following determinations:

1. Evidence of pre-July 26, 1965 occurrences or conditions, not admitted in

*Deal,* is admissible in the present case to the extent that it is relevant to show the existence or non-existence of post-July 26, 1965 violations by the Cincinnati defendants.

2. Evidence of pre-July 26, 1965 occurrences or conditions, not admitted in *Deal,* is admissible to the extent that it will facilitate an understanding of testimony in this case.

3. Evidence of pre-July 26, 1965 occurrences or conditions, not admitted in *Deal,* which is not relevant or will not facilitate an understanding of testimony is not admissible.

4. Except by way of proffer, no evidence of pre-July 26, 1965 occurrences or conditions, not admitted in *Deal,* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

5. No finding should be made on the basis of evidence of pre-July 26, 1965 occurrences or conditions, not admitted in *Deal,* that the Cincinnati defendants violated plaintiffs' constitutional rights prior to July 26, 1965.

6. The above restrictions would not apply to plaintiffs' allegations concerning interdistrict violations, which were neither raised nor litigated in *Deal.*

### E. *Admissibility of Cumulative Evidence*

The final evidentiary question concerns "cumulative evidence." Judge Lively notes that "the district court referred to the cumulative evidence of a possible constitutional violation." 525 F.2d at 350. Judge Lively approved consideration of such evidence, stating:

"Ultimate decision of the present case will necessarily require consideration of cumulative evidence. Adherence to the doctrine of issue preclusion in no way forecloses consideration of such evidence."

*Id.* In order to appreciate what is meant by cumulative evidence it is helpful to refer to Judge Porter's opinion (doc. # 56), wherein he discusses same. In the context of discussing *Berry v. School District of City of Benton Harbor,* 505 F.2d 238 (6th Cir. 1974), Judge Porter states:

"While refusing to hold as a matter of law that defendants had an affirmative duty to alter attendance lines, the *Benton Harbor* Court did declare . . . that defendants' decision 'not to adopt new attendance boundaries in the face of a readily discernible pattern of residential segregation may be considered part of the cumulative evidence of a possible constitutional violation.' "

(doc. # 56, at 14).

The paragraph from *Berry, supra,* which Judge Porter paraphrased, provides:

"The instant suit was commenced after consolidation and no court action was pending against the school district prior to that time. There has been no judicial findings that defendants were operating a dual school system and the defendants had made no determination that action ought to be taken. Further, the attendance lines had existed in substantially the same form for a number of years prior to consolidation and before any complaint of segregation. In light of the above, we cannot say as a matter of law that defendants were under a duty to alter the attendance lines in 1965. Defendants' decision, however, not to adopt new attendance boundaries in the face of a readily discernible pattern of residential segregation may be considered *part of the cumulative evidence of a possible constitutional violation.*"

*Berry, supra* at 242–43. (emphasis added).

In this Court's view, the Sixth Circuit's statements in *Benton Harbor* more than adequately describe what is meant by cumulative evidence. Using the example given therein, and elaborating on it somewhat, only for purposes of clarification, plaintiffs could show that attendance lines for the Cincinnati schools had existed in substantially the same form for a number of years. They could show that these lines had existed since before the decision in *Deal.* They could then attempt to show the

existence of a readily discernible pattern of residential segregation of which the Cincinnati defendants were aware, in the period since July 26, 1965. They could further attempt to show that, despite these readily discernible patterns of residential segregation, the Cincinnati defendants did not adopt new attendance boundaries. Such a scenario, if proved, could be received as *part* of cumulative evidence of a possible constitutional violation subsequent to July 26, 1965. Such evidence would in no way require or necessitate a finding of a pre-July 26, 1965 violation; no segregative intent could attach to decisions made prior to that date. However, such evidence would be considered together with other evidence which, collectively, might lead the Court to conclude that the Cincinnati defendants did, after July 26, 1965, commit constitutional violations.

Based on the foregoing, the Court makes the following conclusions (assuming this Court deems the Sixth Circuit decision in *Bronson* to be applicable):

1. To the extent that evidence of pre-*Deal* conditions are a necessary predicate to establish the basis for a post-1965 violation, it is relevant, and therefore, admissible.

2. No segregative intent would attach to any actions, inactions or policies of the Cincinnati defendants prior to July 26, 1965; that is, segregative intent attaches, if at all, only as to actions, inactions or policies taken after July 26, 1965.

3. Actions, inactions or policies established prior to July 26, 1965, which had not been altered since that date, could be considered, together with other evidence, as cumulative evidence of a post-July 26, 1965 violation.

## III. SUMMARY OF CONCLUSIONS

The foregoing discussion has been limited to this Court's interpretations of the 1975 Sixth Circuit decision in *Bronson v. Board of Education.* The conclusions expressed therein are derived solely from that decision, and no attempt has been made to anticipate the parties' arguments for or against the continued applicability of that decision in light of changes in the law subsequent to 1975. Wherefore, on the basis of the aforesaid discussion, the Court summarizes its conclusions as follows:

1. The only opinion binding on this Court in *Bronson* would be that of Judge Lively. If that opinion is followed by this Court, no attack on Judge Peck's Findings of Fact or Conclusions of Law in *Deal* would be permitted in the present case.

2. The claim preclusion aspect of res judicata would be inapplicable to the present case.

3. Collateral estoppel would bar relitigation of any of the issues litigated in *Deal* and would preclude all present *Bronson* plaintiffs from attacking *Deal.* To the extent that plaintiffs' Second Amended Complaint may contain allegations of unconstitutional conduct by the Cincinnati defendants prior to July 26, 1965, which are unrelated to alleged interdistrict violations under theories two and three in *Milliken v. Bradley, supra,* evidence adduced of same would not be received for the purpose of establishing such a violation.

4. Collateral estoppel would not apply to bar litigation of issues based on allegations of misconduct by the Cincinnati defendants occurring subsequent to July 26, 1965.

5. With respect to post-1965 allegations raised in the Second Amended Complaint, there would be no distinction made between plaintiffs who were in school at the time of *Deal,* and those who were either not born or not yet in school at that time.

6. There would be no finding of liability made against the state defendants on the basis of actions, inactions or policies of the Cincinnati defendants prior to July 26, 1965, that is, the state defendants would be entitled to assert the applicability of collateral estoppel.

7. Plaintiffs would be foreclosed from relying on the first theory in *Milliken, supra,* as a basis for establishing an interdistrict violation and/or effect prior to July 26, 1965. Liability under this theory would have to be established on the basis of segregative acts committed by the Cincinnati defendants after July 26, 1965.

8. The doctrine of collateral estoppel would not apply to theories two or three in *Milliken*; therefore, plaintiffs would be free to attempt to show, without time constraints, that one or more of the suburban defendants committed segregative acts within their school districts which caused a significant segregative effect in the Cincinnati City School District, or that there were segregative acts occurring between the Cincinnati defendants and one or more of the suburban defendants.

9. The facts stipulated or proven in *Deal* would be judicially noticed by this Court.

10. Evidence admitted in *Deal* would be admissible in the present case to the extent that it is relevant to show the existence or non-existence of post-July 26, 1965 violations committed by the Cincinnati defendants.

11. Facts stipulated or proven in *Deal* would be admissible to the extent that they would facilitate an understanding of testimony in this case.

12. Evidence admitted in *Deal* which does not provide background or which is not relevant would not be admissible.

13. Except by way of proffer, no evidence admitted in *Deal* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

14. No finding would be made on the basis of evidence admitted in *Deal* and admitted in the present case that the Cincinnati defendants violated the plaintiffs' constitutional rights prior to July 26, 1965.

15. Restrictions imposed on the admissibility of evidence admitted in *Deal* would not apply to plaintiffs' allegations concerning interdistrict violations, which were neither raised or litigated in *Deal.*

16. Evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would be admissible to the extent that such evidence would facilitate an understanding of testimony in this case.

17. Evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would also be admissible in the present case to show the existence or non-existence of post-July 26, 1965 violations by the Cincinnati defendants.

18. Except by way of proffer, no evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* would be received if offered solely for the purpose of establishing a pre-July 26, 1965 violation by the Cincinnati defendants.

19. No finding would be made on the basis of evidence of pre-July 26, 1965 occurrences or conditions not admitted in *Deal* that the Cincinnati defendants violated plaintiffs' constitutional rights prior to July 26, 1965.

20. Evidence of actions, inactions or policies of the Cincinnati defendants, established prior to July 26, 1965, which have not been altered since that date, would be admissible, and would be considered, together with other evidence as cumulative evidence of a post-July 26, 1965 violation by the Cincinnati defendants.